OPINION. TURNER, Judge: The petitioner does not question the correctness of the respondent’s determination of its excess profits tax, computed without the benefit of section 722 of the Internal Eevenue Code. It does contend, however, that the tax so computed is excessive and discriminatory if section 722 (b) (4) of the Code[10] is not applied. The petitioner has alleged error by the respondent as to both wine and brandy. Under the wine issue, there are two questions for determination, namely, whether the beginning of operations under the Fawver agreement in 1987 was a change in the character of petitioner’s business within the meaning of section 722 (b) (4), and, if so, what is the amount at which its average base period net income is to be reconstructed by reason thereof. Under the brandy issue, we have only the problem of determining the amount at which the average base period net income is to be reconstructed, since the respondent has already determined, and here concedes, that a change in the character of the brandy business did occur in 1937, when petitioner began the production of commercial or beverage brandy, a new product. The petitioner has raised no issue under section 722 (b) (5), and at the hearing, its counsel specifically disavowed any claim that there was, by reason of the commencement of operations under the Fawver agreement or of the beginning of the production of commercial brandy in 1937, any change in its “capacity for production or operation of the business consummated during any taxable year ending after December 31, 1939, as a result of a course of action to which the taxpayer [petitioner] was committed prior to January 1, 1940.” The petitioner makes no claim that its wine sales would have been any greater in 1936 and 1937 if it had begun operations under the Fawver arrangement in 1935, instead of 1937, but is does claim that such sales would have been substantially greater in 1938 and 1939 than they actually were. In substantiation of this claim, it points to the drop in 1938 and 1939 in the volume of wine sold and argues that this drop was brought about by the depletion of its wine inventories through the increased sales in 1936 and 1937 and its lack in those years of adequate facilities for storing and aging enough wine to maintain the said inventories at a proper level, all of which would have been avoided if operations under the Fawver agreement had commenced two years before they did. It is the claim of the respondent, on the other hand, that there being no actual expansion or change in the petitioner’s physical plant, and since the petitioner did not, under the arrangement, produce and store wine for its own account but for Fawver and if and when it desired to acquire the Fawver wine for blending and bottling with its own wines for sale, it was required to pay the current market price therefor or to meet the best offer Fawver might receive from an outside party, the petitioner was, for all practical purposes, in no different position with respect to the Fawver wines than it woúld have been with respect to any other wines which might be bought in bulk in the open market and that an arrangement for such buying of wine if and when needed does not qualify as a change in petitioner’s capacity for production or operation within the meaning of the statute. The petitioner’s standing in the trade as a producer of fine, wines had been established long since. It did not sell its wines as vintage wines but as blended wines, seeking to maintain the high standard of quality for its products year after year. During prohibition, it had been authorized to produce and sell wine for sacramental purposes, and at repeal had an inventory of old wine on hand. With repeal, the demand for wine was greatly in excess of the productive capacity of the industry as it then existed, and those producers having wine inventories could have sold their entire stocks of wine immediately. Some of the petitioner’s competitors did sell their stocks, but petitioner did not. It desired to maintain its standing as a producer of fine wines and an adequate stock of aged wine for blending was essential if that purpose was to be carried out. By the end of 1936, wine consumption in the United States had doubled what it had been in 1934, and from 1936 to 1939, continued to increase steadily, although at a slower rate. Petitioner’s problem was to keep its sales in step with the growth of the wine industry generally and at the same time to build up its inventory of aged wine to the desired and needed level. Toward that end it began, in 1935, the construction of additional storage facilities and by September 1,1937, had increased its capacity for storing and aging wine from 365,363 gallons to 570,819 gallons. The petitioner sold both old wine and new wine. At some point of time, as early at least as 1936, it began selling its old wine under the label Los Hermanos and its new wine under the label Mountain Banch. In blending and bottling its Los Hermanos or old wines, petitioner has made it a practice of using wines which have been aged for two years, or more. In 1934 the ratio of its old wine sales to sales of new wine was approximately four and one-half to one, but in 1935 the sales of new wine increased at such a rate that the ratio had dropped to slightly less than two to one. Early in 1936, at the instigation of a new sales manager, a program of further promoting the sales of new or Mountain Ranch wine was instituted. In that year the ratio of old wine sales to sales of new wine became approximately four to three, and in 1937 it was in the neighborhood of ten to nine. It had already become apparent to the petitioner’s manager and winemaster that it could not, with its existing wine inventories and the space which it had for storing and aging wine, continue wine sales at the 1936 and 1937 rates if the established standard and quality of its wines was to be maintained. It could continue the current rate of promotion and sale of its new or Mountain Ranch wines only at the expense of Los Hermanos. Otherwise it would have to cut back its wine sales so as to store and age a sufficient quantity of its new production each, year to provide the needed amounts of aged wines for blending and sale under the Los Hermanos label, or it would have to find some other means of supplying itself with such wines. It was faced with these alternatives because it was not in a position to increase further its own plant. In addition to the construction of the added wine storage facilities beginning in 1935, it had in that year also erected a distillery for making brandy. As a result, it had gone as far with new construction as its finances would permit. It had also utilized substantially all of the building space which it had available. In the arrangement with Fawver, the petitioner found a solution to its problem, but not in time to prevent a cutback or drop in its sales for 1938 and 1939. Operations under the Fawver arrangement did not begin until 1937 and wines from the 1937 grape crush would not be ready, under petitioner’s usual practice, for blending and sale as Los Hermanos wines until 1939, and later. Furthermore, in an attempt to maintain an adequate supply of wine for sale under the Los Hermanos label, the petitioner in 1938 made a departure from its usual practice and blended 100,000 gallons of its 1937 wine production with approximately 32,000 gallons of its aged wine.[11] Its sales under the Los Hermanos label in 1938 and 1939 were approximately at the level of such sales for 1936 and 1937, respectively, whereas sales under the Mountain Ranch label were substantially reduced. The ratio of Los Hermanos sales to Mountain Ranch sales in both 1938 and 1939 was about five to three, as compared with ratios of four to three in 1936 and ten to nine in 1937. It is true, as the respondent contends, that the petitioner did not, under the Fawver arrangement, expand or change its own physical plant or increase its owned wine inventories to any substantial extent during the base period, and undoubtedly, the picture case, so to speak, representing a change in capacity for production or operation, under the statute, would be a case where there was a change in the taxpayer’s physical capacity for production or operation. Even so, however, we think the position of the petitioner- is well taken and that it did, through the Fawver arrangement, effect a change in its capacity for production or operation within the meaning of the statute. At the time the agreement was made Fawver’s storage tanks were contaminated with acid and the wine stored therein was not, to say the least, a desirable wine for sale as beverage wine. Under the arrangement, the petitioner furnished the services and advice of its winemaster in cleaning up the Fawver winery and putting it in proper condition for the storing and aging of fine wines. Also Fawver was to receive and did receive the supervisory services of petitioner’s winemaster in the making of his wines, beginning with the 1937 grape crush, and in the subsequent operations connected with the storing and aging of that wine. In return, Fawver agreed that petitioner should have the right to acquire his entire wine inventory made under the agreement. If it became necessary or desirable for him to sell, he agreed first to give the petitioner the opportunity to buy the wine to be sold, at the current market price or at the highest price offered by any outside party. There is every indication, from the record made, that both Fawver and the petitioner looked upon the agreement as one under which petitioner would acquire all of his wines. There is no doubt, we think, that petitioner from 1937 on included the Fawver wines in its plans for future operations, just as it did its own production. Petitioner’s financial condition at the time made the arrangement particularly attractive. Unless for some reason Fawver found it necessary or desirable to sell some of the wines at an earlier date, petitioner was not required to expend anything but a portion of its winemaster’s time, until the wines were needed for blending and bottling for sale. Fawver’s winery was within twelve miles of petitioner’s winery and petitioner’s manager and winemaster could supervise Fawver’s operations in substantially the same manner as he did those of the petitioner. The situation being as described, it is our opinion that the petitioner did in fact increase its capacity for producing, storing and aging wine by reason of the agreement with Fawver. In corroboration, it appears that the workout under the arrangement was for all practical purposes as effective as if petitioner had acquired in its own right the facilities used. The petitioner, in due course, did acquire all of the wine produced, stored and aged for Faw-ver under the supervision of its manager and winemaster. In December 1939, when Fawver was entering a hospital for an operation, the oral agreement was changed into a written agreement. This agreement contemplated that petitioner would buy Fawver’s 1937 vintage red wine in the first year, the 1938 wine the second year and the 1939 wine the third year. The terms were that it was to buy 20,000 gallons of the 1937 vintage in thirty days, at 17 cents per gallon, and was to have options to buy 125,000 additional gallons the first 6 months and 125,000 gallons more the second 6 months, all at the same price. At petitioner’s option, it could renew the agreement one year from date and at the end of each 6 months thereafter, for a total period of 3 years, so as to buy Fawver’s 1938 and 1939 red wine at prices to be agreed upon. It was contemplated that the options, if exercised, would absorb Fawver’s entire annual vintage of red wine and Fawver agreed not to sell any such wine to any third party unless petitioner’s options to buy should expire. The first of the wines made for Fawver under Abruzzini’s supervision were two years old in September or October of 1939, and in 1940 petitioner’s sales of Los Hermanos wines were 100,123 gallons, as compared with 93,519 gallons for 1938, the highest for any prior year, and with 86,303 gallons for 1939, and its Mountain Ranch sales were 74,311 gallons, as compared with 51,272 gallons for 1939, 53,753 gallons for 1938, and 78,589 gallons for 1937. By and under the Fawver agreement, which became effective with the grape crush of 1937, the petitioner did effect a change in its capacity for production or operation of its business within the meaning of section 722 (b) (4), and its wine business did not, by the end of 1939, reach the earning level which it would have reached if petitioner had commenced operations under the agreement in 1935, instead of 1937. As against respondent’s determination of a constructive average base period net income of $37,967.56, the petitioner contends that $62,614 is the fair and just amount to be used as its constructive average base period net income, an increase of $24,646.44. It has made no attempt, however, to show what part of the claimed increase of $24,646.44 would be attributable to wine and what part to brandy. Its accountants have indulged in some very elaborate and complicated tabulations in which their conception of the claimed results of the wine, brandy and miscellaneous operations have been segregated, except for what are termed general administrative and financing expenses. These latter expenses have not been allocated between the three categories mentioned, but have been deducted in a lump sum from the aggregate of the wine, brandy, and other profits, computed as stated, to arrive at the claimed constructive average base period net income of $62,614. The respondent, on brief, has attempted an analysis of the said tabulations up to the point of demonstrating that of the claimed increase of $24,646.44 in constructive average base period net income, only $3,741 is claimed as the average base period net profits which would have resulted from the added wine sales claimed for 1938 and 1939. The petitioner, in its reply brief, does not challenge the correctness of the respondent’s figure of $3,741, and we accordingly conclude that it accepts that figure as being a proper statement of its claimed added average base period net income attributable to wine. In such circumstances, it would follow that the remainder of the $24,646.44, or $20,905.44, is the amount petitioner claims as the average base period net income that would have resulted from brandy sales over and above the increase with respect thereto already allowed by the respondent in his determination, and if a breakdown of the total claimed average base period net income of $62,614 be approached in that manner, the result would appear as follows: Constructive average base period net profits from brandy allowed by respondent_$20, 779. 74 Actual average base period net income from wine and miscellaneous operations as determined by respondent_ 17,187. 82 Total_ 37, 967. 56 Additional constructive average base period wine net income claimed by petitioner- 3,741. 00 Additional constructive average base period brandy net income claimed by petitioner_ 20,905.44 Total constructive average base period net income claimed by petitioner_$62, 614.00 Total claimed constructive average base period net income from wine and miscellaneous operations_$20,928.82 Total claimed constructive average base period net income from brandy_ 41, 685.18 Total constructive average base period net income claimed by petitioner_$62, 614. 00 Generally, the basis of petitioner’s claim is that if it had started operations under the Fawver agreement in 1935, instead of 1937, its wine inventories would have been such that it would not have had to curtail its wine sales in 1938 and 1939 and it would have sold 20 per cent more wine in 1938 and 50 per cent more in 1939 than it actually did sell in those years, and if it had started producing commercial or beverage brandy in 1935, instead of 1937, it would, at the end of 1939, have been selling bottled brandy at the rate of 45,000 original proof gallons per year, and that if its base period net income is reasonably and properly reconstructed on the basis of the assumed increases in wine and brandy sales, its constructive average base period net income will be $62,614, as claimed. It is not possible, on the record before us, to make any satisfactory determination as to the amount by which the petitioner’s average base period net income would have been increased if it had commenced operations under the Fawver agreement in 1935, instead of 1937. As to wine, petitioner makes no claim that its sales or profits would have been any greater in 1936 and 1937 than they actually were. The increases in wine sales claimed for 1938 and 1939 are based on the testimony of the manager of the sales agency that in his opinion he could have sold 20 per cent more wine in 1938 and 50 per cent more in 1939 if he had had sufficient wine available. Also, seemingly by coincidence, petitioner’s accountants have made their computation of constructive average base period wine net income on the same assumed increases in wine sales, the explanation being that if 1936 sales be regarded as normal and the ratio of petitioner’s wine sales in 1936 to total apparent consumption of wine in the United States during that year be applied for 1938 and 1939 petitioner’s sales for 1938, to be normal, should be 20 per cent higher and its sales for 1939, 50 per cent higher.[12] The computation of the claimed profits from such assumed sales by petitioner’s accountants is purportedly based on the actual costs and selling prices of the wine which petitioner actually did sell in 1938 and 1939, adjusted to cover the assumed additional sales and with further adjustments of various of the costs relating directly to processing, bottling, and selling of the wine and comparable adjustments in the general administrative and financing expenses. Except for a few minor items, which in reason would remain constant, such as the winery license fee, and others, such as commissions, which might be expected to increase ratably as volume increases, adjustments have been made ranging from those designated “normal increase” for most of the items under winery and cellar department and for numerous other cost items to as high as 179.67 per cent for 1939 bad debts, marketing and license tax, and cash discounts. Most of these adjustments are, so far as we are able to determine, based on the guesses and assumptions of the accountants, since we are unable to find any other basis therefor in the evidence of record. Conceivably the petitioner has been quite conservative as to the “Direct Costs” (seemingly all costs exclusively attributable to wine, other than winery and cellar costs, bottling and labeling expense, and selling and shipping expense) applied to the assumed increased wine sales for 1938 and 1939. These costs are purportedly computed at the same rate per gallon as the “Direct Costs” to petitioner of the wine it actually did sell in those years and the rate applied is substantially in excess of the cost per gailon to petitioner for the Fawver 1937 vintage red wines as fixed by the written agreement of December 7, 1939. If, however, petitioner had started operations under the Fawver arrangement in 1935, instead of 1937, and had made the needed purchases under the oral agreement in 1938 and 1939, it would have been obligated to pay the current market price for such wines or an amount equal to the best offer Fawver might receive from some outside party. Petitioner has made no showing as to what the market price was for such wines if under such assumed circumstances purchases would have been made in 1938 and 1939 under the oral agreement. Assuming, however, that the “Direct Costs” of Fawver wines in 1938 and 1939 would have been at least as low as the costs applied, and, aside from the unsupported assumptions of the accountants as to the adjustment of other cost items, we have a further difficulty with petitioner’s claimed reconstruction of its wine profits, in that we are unable to conclude that the sales rate per gallon at which petitioner has constructed its assumed increased wine sales is realistic. The figure used is an average rate per gallon at which petitioner’s combined sales of Los Hermanos and Mountain Ranch wines were made in 1938 and 1939. The facts show that generally it was the hope of the petitioner eventually to cease or greatly reduce its sales of wine under the Mountain Ranch label and sell all, or substantially all, of its wines under the Los Hermanos label. Presumably the production and sale of the Los Hermanos wines was the more profitable. The facts indicate that the cutback in wine sales in 1938 and 1939 was in sales under the Mountain Ranch label, and not in the sales under Los Hermanos. In such circumstances, the average of actual sales would give a greater per gallon rate than would be fitting and proper for bringing Mountain Ranch sales back to what would have been a normal level of Mountain Ranch sales in those years. Another factor which might well have some bearing on the matter is the showing that in 1938 and possibly in 1939 a goodly portion of the sales made under the Los Hermanos label were made from a blend of 32,000 gallons of aged wine and 100,000 gallons of new wine which had just been produced in the fall of 1937, preceding. Except for the fact that some difficulty was experienced with the wine so blended and sold, as illustrated by the Philadelphia situation, we are not advised as to the results. Undoubtedly the direct costs for the 100,000 gallons of new wine so used were considerably less than would have been the direct costs of wine which had been aged for two years or more. On the other hand, there is no indication or showing that the sales of the blend in question made under the Los Hermanos brand were not sold at the established Los Hermanos prices, which could mean that the margin of profit actually realized for such wine at Los Hermanos prices might well have been substantially greater than the margin of profit which would have been realized on the Los Hermanos wine which would have been sold from the usual blends of aged wines if the Fawver wines had been available two years before they were. The circumstances being as they are, the record not only falls far short of substantiating the claims of the petitioner as to the amount by which its average base period net income should be reconstructed to reflect the wine sales which it would have had if it had started working under the Fawver arrangement two years earlier, but, in our opinion, is persuasive of a substantially lesser amount than the constructive average base period net income increase of $3,741 claimed. In that situation, we must make the best determination we can from the record before us, bearing most heavily against the petitioner, whose burden it was to prove the facts. Cohan v. Commissioner, 39 F. 2d 540. It is accordingly our conclusion, and we have found as a fact, that if petitioner’s arrangement with Fawver had started 2 years earlier than it did, the average base period net income resulting from the increased wine sales in 1938 and 1939 would have been $2,000. As to brandy, the petitioner rests its constructive average base period net income claim on assumed average base period sales of 45,000 original proof gallons of bottled beverage brandy and an assumed profit of $1,313 per gallon, before charges for general administrative and financing expenses. The claimed sales volume of 45,000 original proof gallons is in the fullest sense an assumed figure. So far as we are able to find, the only supporting evidence, and apparently the only evidence relied on by the petitioner, is testimony to the effect that Beringer, petitioner’s president, in building the distillery, had settled upon 45,000 original proof gallons as the quantity of commercial or beverage brandy which petitioner would strive to produce and sell when its brandy business was established; and the testimony of the sales manager of Beringer Brothers Sales Agency, to the effect that in his opinion he could have been selling 4-year-old brandy at December 31, 1939, at the rate of 57,000 gallons per year, if such brandy had been available. The testimony as to the goal Beringer had in mind for the beverage brandy business requires no comment. Certainly it supplies no factual basis for reconstructing petitioner’s brandy profits on assumed average base period brandy sales of 45,000 original proof gallons. As for the sales manager, we have only his bald assertion that in his opinion he could have been selling 4-year-old brandy at the end of 1939 at the rate of 57,000 gallons per year, and in light of various facts which have been established and the responses of the witness himself to questions on cross and redirect examination, the amount of assumed sales claimed is, so to speak, left dangling and unsupported in mid-air. In the pleadings, we have not found any allegations that the claimed constructive average base period net income was based on claimed assumed sales of 4-year-old brandy. Also, one of petitioner’s accountants, called as á witness was asked by the Court at the conclusion of his testimony, “Just to make sure the record is clear” whether “the reconstructed sales of brandy were reconstructed sales of two-year-old brandy,” and he replied, without further explanation or qualification, “That is correct, reconstructed on the basis of sales of two-year-old brandy in 1939.” On brief, however, the petitioner makes claim that by the end of the base period it would have been selling 4-year-old brandy at the rate of 45,000 original proof gallons per year, and for that reason its brandy profits should be reconstructed on assumed sales in the base period of 4-year-old brandy, rather than 2-year-old brandy. To support this claim, it points to the testimony of the sales manager as to the quantity of 4-year-old brandy which he thought he could have been selling at the end of the base period if it had been available. It is stated that the testimony of the accountant clearly had to do only with the rate at which the assumed base period brandy sales were reconstructed, in that petitioner being barred by the statute from using the results of its sales of 4-year-old brandy, all of which occurred after the base period, was limited, for reconstruction purposes, to its actual experience in selling 2-year-old brandy in 1989 and that it was in no way an indication that the reconstructed sales as claimed were reconstructed sales of 2-year-old brandy. It is to be noted at this point, however, that in the reconstruction of 1939 sales, about which the accountant was testifying, there were included as a part of the assumed sales of 45,000 original proof gallons 19,060 original proof gallons of brandy made for the Growers Grape Products Association in 1938 and which would not have been four years old until late 1940, even if it had been made in 1936, two years before it was. Regardless, however, of whether the claim that its average base period brandy profits be reconstructed on assumed sales of 4-year-old brandy was or was not an afterthought, the reconstruction claimed still fails to find support in the facts of record. The petitioner made its first commercial beverage brandy in March or April of Í937 and if it had actually started such production 2 years before it did, it could not, until March or April of 1939, have had any 4-year-old brandy. In such case, it could have started selling 2-year-old bottled brandy in 1937, but the sales manager, who professed to being one of the best in the business, conceded that if he had started in 1937 he could not have sold in that year more 2-year-old or no-age brandy, or in fact more of any brandy less than 4 years old, than actually was sold in 1939 and that any increases in 1938 and 1939 sales of such brandy would have been only such nominal or gradual increases as would have been due to trade acceptance of petitioner’s label. In such circumstances, and at such rate, the petitioner would have sold by May of 1939 approximately 5,250 original proof gallons of bottled brandy. In addition to the bottled brandy sold in 1939, the petitioner actually did sell in 1937, in one sale in bulk, 10,457 original proof gallons of its brandy made in that year. At the most, then, it could have had left in 1939 of the 33,895 gallons made in 1937 for its own account only 18,188 gallons which, with the 12,683 original proof gallons made in 1937 for Fawver’s account, would have made 30,871 original proof gallons as the maximum amount of 4-year-old brandy which petitioner could have had available for sale at any time during 1939, or at any time during the base period. On the record made, however, we do not believe that it may be reasonably or fairly concluded that the petitioner could in 1939 have sold the above brandy as 4-year-old brandy at a rate even approaching that contended for. According to the evidence, brandy production in California began with repeal of prohibition in 1933, and various producers were and would have been in the market some considerable time ahead of petitioner, even if it had started production in 1935. The facts show that 2,324,000 gallons of brandy were made in California in 1934, which was substantially the same as the average consumption of brandy in the United States for the years 1935 through 1939 and that brandy inventories in California as early as December 31,1935, were close to double the apparent consumption of California brandy in the United States as a whole for all of 1935 and the inventories at December 31,1936, and December 31,1937, stood in substantially the same relation to apparent United States consumption of brandy for 1936 and 1937. The facts also show that apparent consumption of brandy in the United States in 1938 was not quite 85 per cent of what it had been in 1937 and that this drop, in the main, was in the consumption of California brandy. Such consumption did increase to some extent in 1939 over 1938, but 1939 consumption was still less than it had been in either 1937 or 1936. The sales manager testified that brandy is not one of the faster selling items in a liquor store and after the shelves are stocked it is difficult to introduce a new line or brand. The liquor store is not inclined to substitute a new and untried brand for a line of brandy which is already established, and can normally make room for a new line only by getting rid of its slowest moving brand, which is in and of itself a difficult thing, except at substantial sacrifice. He also testified that the main factor in launching the sale of the petitioner’s brandy was the prestige of the name Beringer Brothers, but admitted that that effect was limited to those who had known Beringer products before prohibition. As to newcomers in the business, the name supplied no such leverage. Furthermore, it is to be noted that the brandy produced and sold by petitioner in the pre-prohibition days was very fine cognac brandy, made on a small scale in the pot still. It could not, in such circumstances, have had a very wide market. It is also obvious that the brandy made by petitioner from the Fawver wines in 1937, and which would have been 4 years old sometime during 1939, was not, in fact, quality brandy and could not have been sold as a counterpart of petitioner’s pre-prohibition brandy. It was petitioner’s purpose in reentering the beverage brandy field to manufacture and sell high quality brandy in keeping with the standard of its wines, and the brandy made in 1937 was not such brandy. The attempt at selling it as 2-year-old brandy in 1939 was prompted by petitioner’s desire to get its label on the market as quickly as possible and the 1937 brandy was the best, in fact the only 2-year-old brandy, it had available for that purpose. Accordingly there is nothing in the record which in any way convinces us that even if petitioner had made the 1937 brandy in 1935 and had desired and intended to age it and sell it as bottled brandy, it could have sold such brandy as 4-year-old bottled brandy in 1939 at a rate of more than ten to twelve thousand gallons per year, if at that rate. In addition to what has already been said above, there is little or no reason to believe that the petitioner would have carried any substantial portion of the brandy made in 1937 from the Fawver wines for the purpose of selling it as 4-year-old brandy in the bottled brandy market. In its claim for relief, petitioner gave as its reason for beginning the sale of the brandy in 1939 as 2-year-old bottled brandy its “financial inability to carry a supply of brandy through the full four years.” It is also to be noted that in 1937 the petitioner made a bulk sale of 10,457 original proof gallons of the 33,895 gallons of brandy made for its own account in that year. Its reasons for making the sale were both because of its financial condition and because the brandy, having been made from wines of high acid contents, was not brandy of the quality which it desired to age and establish on the market. Although it had not up to the time of sale been required to pay for the wine used, in making the brandy, it did have tied up in the brandy its costs of distilling and cooperage, and would be faced with subsequent costs of storing and aging; and in addition, it could not only get its money out of the brandy in question but it could make the sale at some profit. The petitioner’s manager and winemaster testified that the 1937 brandy was fair, but not of the best, and that it was not until the fall of 1938, when it made brandy under the prorate plan and acquired right of purchase thereto, that brandy of the quality desired by petitioner for its brandy business became available to it. The prorate brandy was made “from new wines that were made from good grapes and low acids.” If it had been made in 1936, instead of 1938, it would have been 2 years old in 1938, but would not have been 4 years old until late 1940. Bulk sales of brandy were not unusual in the industry and, on the facts shown, we think that more likely than not the petitioner, even though it may have had the selling of bottled brandy in mind when it built its distillery, would have sold the brandy made by it from the Fawver wines both for its own account and for Fawver’s account in bulk sales as the opportunity offered, and not as bottled brandy, except such limited quantities as it might put on the market in its effort to get its label before the public pending the time when it would be in a position to bottle and sell brandy of the quality such as that which was made in 1938 under the prorate plan. It would not, in our opinion, have had any substantial amount of such brandy for sale in 1939 as 4-year-old brandy. The petitioner makes some further claim that the rate of profit per gallon applied by the respondent in arriving at the constructive average base period brandy net income determined and allowed by him was intended and determined to be the profit per gallon actually realized by petitioner on the sales of 2-year-old bottled brandy made by it in 1939, that the profit per gallon actually realized by petitioner on such sales was, in fact, substantially higher, and, even though its claimed average base period sales of 45,000 original proof gallons be denied, it is still entitled, under the respondent’s own determination that average base period sales would have been 33,368.81 original proof gallons, to constructive average base period brandy profits substantially in excess of the amount so computed and allowed. The respondent admits that the constructive average base period brandy net profits allowed by him were computed at a rate of 69 cents per gallon, and it does appear that the rate in question was the rate originally determined by a revenue agent as the actual profit per gallon realized by petitioner on its 2-year-old bottled brandy sales in 1939. The respondent contends, however, that the allowance as made in his final determination was on assumed base period sales of 2-year-old brandy, both bottled and in bulk, and that the rate per gallon used in arriving at the amount allowed was intended to cover both types of sales, and not only has the petitioner not shown that the combined rate for both bottled and bulk sales should have been higher, but it has not even shown just what net profits per gallon it is claiming for reconstruction purposes, since at no place in the presentation of its case does petitioner indicate what part of its general administrative and financing expenses should be charged to commercial brandy operations. Suffice it to say that it is our opinion and we have already stated our conclusion that constructive average base period brandy net profits have not been shown in any amount above the $20,779.74 allowed by the respondent. Reviewed by the Special Division. Decision toill be entered under Rule 50. SEC. 722. GENERAL RELIEF — CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME. ******* (I)) Taxpayers Using Average Earnings Method. — The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because— ******* (4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. Eor the purpose of this subparagraph, the term “change in the character of the business” includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation, a difference in the ratio of nonborrowed capital to total capital, and the acquisition before January 1, 1940, of all or part of the assets of a competitor, with the result that the competition of such competitor was eliminated or diminished. Any change in the capacity for production or operation of the business consummated during any taxable year ending after December 81, 1939, as a result of a course of action to which the taxpayer was committed prior to January 1, 1940. or any acquisition before May 81, 1941, from a competitor engaged in the dissemination of information through the public press, of substantially all the assets of such competitor employed in such business with the result that competition between the taxpayer and the competitor existing before January 1, 1940, was eliminated, shall be deemed to be a change on December 31, 1939, in the character of the business.* * * As shown in the findings of fact, petitioner experienced some difiiculties with this batch of wine. It may be noted in passing that while the consumption of wine in the United States for 1938 showed some increase over such consumption for 1937 the consumption of California wine in the United States in 1938 was substantially less in 1938 than had been the consumption of California wine in 1937.